Good morning, Your Honors. Jeff Blank, representing the plaintiff and the appellant, referred to as L.W. He's now an adult. This was six years ago. I'd like to reserve probably four or five minutes for rebuttal, and we'll see how that works out. Can I ask you about that? You say that it's L.W., but on the face of your briefs on the blue cover page, it actually has his name. Yeah. My client, referring to Landon Wynar, is not a problem for my client. Okay. I just wanted to clarify with you, because I'm happy to do L.W., but it seemed you already kind of let the cat out of the bag. Yes. That came up briefly. And I'll refer to him as Landon. I think it's just easier for clarity. All right. I'd like to call the Court's attention to the ER 371. That's the notice of expulsion. It really sets the parameters of what the defendants did. In that document, they charge Landon with violating School District Policy 529, subsection 5, impairing or threatening teachers or students, also number 14, violating established school regulations. Then they also cited NRS, the Nevada state law, 392-4655, which is, ironically, habitual discipline for a one-time threat against teachers or students. And then they add, a threat is defined in NRS 392.915. Now, by adding that, that was a misdemeanor or gross misdemeanor statute. It requires intent. In other words, what was Landon's intent when he made this threat? So looking at that one statute, which is ER 548, it does state that a person shall not, through any means of oral or written or electronic communication, threaten to cause bodily harm or death to a pupil or employee of the district with the intent to, and then it lists three things. Frighten, and alarm or distress the pupil or the employee, cause panic or civil unrest, or interfere with the operation of the school. None of that occurred here. We have a conversation between two 16-year-old boys with improper, vulgar language that was done at home. None of them, well, Landon never took it to school. All the cases cited and all the cases I found from the Ninth Circuit and otherwise have a direct connection to the school district. In other words, the student, the Levine case is a classic. It's like the student had an assignment. He writes to the teacher, I'm going to kill everybody in my class and you too, and turns it in. Well, this has a direct connection to the school because he's talking about school killings, shootings. He's talking about students in the school. Why isn't that a connection to the school? Because it has to be communicated. It's not a threat. In other words, there is a, can the school take any action, and my position is they can take action. What it doesn't meet the definition of is a threat that requires expulsion. In other words, if the school district learns of a conversation amongst pupils anywhere that they feel may give rise to some safety issues, it's like, great, let's call the student in, let's have a psyche valve done and see is he a threat or not. What happened here was almost strict liability. In other words, what they're saying is you said these words and we found out about it, and because you said these words you're going to be kicked out of school, expelled for 90 school days. I don't care what your explanation is. And it's ironic in this case that when I asked the administrators of, you know, do you have any facts to show that he wasn't just joking with his friend, and they go, no, we don't have any such facts. So you have him making the statement, and what's interesting about the initial expulsion order is the school rule goes by the wayside. The reason being is the school rule says don't talk like this at school, at school functions, or on buses or bus routes. So they drop all that and they're left with only the threat, a threat, a criminal threat to schools and teachers. There has to be mens rea. You have to have the intent. They never find any. They're just saying you said this and you're expelled. So can I go ahead? No, please. No, go ahead. Okay. Well, I guess I, maybe I didn't quite follow the start of your argument, but I guess I thought it was going to be enough for the school to take at least some initial action of keeping him away, as long as they could show that the speech involved, whether it was intentional or not, created, made it reasonably foreseeable that there would be some substantial disruption to school functions. And the character of the speech here certainly seems, in my view, to fit that description. I mean, it's, yeah, we can have an inquiry later to see whether this kid is really serious or not, but on its face, the speech is frightening. And it would cause me as a parent, certainly, if I had a kid going to that school, to say until you guys get this figured out, I don't want my kid there, because this sounds too menacing. Okay. But I would agree, and that's the distinction of what did the school know or not know. These two boys had been talking for months, and in the last several weeks of their conversations, it escalated. And after the Virginia Tech shooting, specifically. And so you have the two boys communicating, there is no disruption actual to the school, and then it's like, well, because they're talking like this, can we, you know, then say, if the school ever finds out, I don't think that's the Tinker standard. The Tinker. The Tinker standard does not have to be an actual disruption. No, no. It's preventative. Correct. Right? So as a school official, if I saw this speech, and I said, wow, do I want this kid coming to school tomorrow? Probably not, because we need to figure out whether he's a real threat. Correct. I don't have a problem with that. And that's the Levine case, where I think Levine handled it appropriately. He made it actually a direct threat. You know, he tells the teacher, I'm going to kill you and my class members. They call the principal, the school psychologist, and they have him evaluated by a psychiatrist. After three times with the psychiatrist, he says, you know, he's not really a threat. And after 17 days, they let him back into school. In this case, they don't care what a psyche bell says. They're saying, you're out for 90 days no matter what. Okay. Can we just separate that so I understand? Are you arguing still against the 10-day suspension, that there's some kind of due process problem? Yes. The 10-day. One is 10 and one is 90. Pardon? One is 10, the other is 90. Correct. I dealt with the 90 first, and I was going to drop back to the 10-day. The 90 is, no matter what, because you said these words, you're out for 90 days, and I'm like, they never requested a psyche bell to say, come back early, if you're not a threat, it's fine. And that's the concern issue. And I'm not – and I deal with schools, and it's like, you're right. When they have a concern, they can go and take some action. What they did here, though, is they said in their suspension document, 579 in the record, we find you violated a Nevada state law of committing a criminal threat. And I'm like, no, he didn't. He was never declared a delinquent by the juvenile court. He's simply released. And there is no finding by the board that suspended him that he made an actual threat or intended anyone to hear this but the other boy. Okay. Well, let's, as Judge McEwen suggested, let's separate the two. Sure. For 10 days, forget about, I guess, any procedural due process violations. Just in terms of the substance of what occurred, you're not challenging the school's right for 10 days to say, you're going to stay away and we're going to need to figure out whether, in fact, you're a real threat. That's correct. They can take action. Okay. But your complaint – again, let's put aside the procedural stuff. Your complaint is that when the school then imposed the 90-day suspension or expulsion – it seems like a suspension if you're allowed to come back. Correct. But the 90-day suspension, you're saying that the defect there from the standpoint of substance is that, what, the school hadn't at that point really determined whether or not he was a threat or – They erroneously concluded that he was. In other words, they never made – they never analyzed his intent one way or the other. They simply said in the record that Landon said these things to the other boy. And he said, do you omit saying these things? And he goes, yes, I did say those things. I was joking. And they're like, we never made a determination. Was he intending to put the victims in fear, which is the Virginia v. Black scenario? And also, interesting, in this Court, in – I guess I don't think it matters whether he was intending to put the victims in fear. It's whether he might actually carry this out, right? Isn't that the school's – from the school's standpoint, isn't that their concern? Their concern – correct. Is he going to do – is he going to take some action? Right. But what they did prematurely is before they make a determination of that, they long-term suspended him for 90 days. Okay. So your position is that 10 days is fine, and if you need a little bit more time, fine, maybe you extend it. But the school's obligation is to do some investigation to figure out whether, in fact, this kid is really serious about acting on these – on this speech. That's correct. Yeah.  What they did here was prematurely they just said, you're out. I don't care what the psychiatrists or psychologists say. I don't care about any of that. You're out for 90. Then upon your return, you have to have a psych eval, and we can search you and do all these things. And I'm like, on what basis? And remind me, what did the psych evaluation? There was two. The first one goes through and elaborates in the record saying he's a great kid, but then he concludes he's a medium to serious risk. And then we had them do a separate one from Washoe County, which is a larger school district. Dr. Weir does a lot. Looking at the same info, Dr. Weir says, no, this is a minimal to medium risk, and it was just based on these e-mails, and that's it. And then the court releases them and says, okay, fine, you can go back to school. Well, the school says, no, you can't. We're not letting you back. Let me ask a little bit different question. The briefs seem to suggest you were making the arguments that the school doesn't have the right to discipline students for off-campus conduct. Tinker and its test would apply for sure at the school. Are you contending that because this conduct occurred outside the school and between the appellant and his friends that somehow Tinker doesn't apply? Personally, I would take that position because I think that allows the school to extend way too far. I don't want your personal opinion. The brief doesn't Tinker apply to the off-campus conduct. I think that's what happened. The Third Circuit came up and said no in the Blue Mountain case, saying, you know, we're not allowing that. And then in the Bethel v. Frazier, they said there's an exception for off, you know, if it's off-campus, and, you know, off-campus speech is just you treat it like anybody else's speech. The Third Circuit case is clearly the same. It was a profile of a principal. It was crude. It was vulgar. Everyone realized it was a joke. These kinds of threats that were made were quite different in context, were they not? They were different. And are you suggesting that the school can't discipline a student who off-campus makes these kinds of what appear to be real threats, where he has the access to weapons, where he is threatening or suggesting he's going to kill somebody on a particular day? Doesn't the school have to step in and do something? That's not the facts here. He didn't give a date. They talked about 4-20 a couple of times. 4-20 was on a Sunday. And that was brought up by the other boy. You don't need a date, though, in light of the nature of the threat. No. But the other thing is false sense of security. All these school shootings, none of those kids made threats. They just went and did it. So now – But you're not suggesting – well, my problem is not with Tinker. I think what he did here is a threat that poses a substantial risk to the school, and the school can take action. What I'm more concerned about and interested is your comment that, well, they can take some action, and even if they took the 10-day, they shouldn't take the 90-day. What's the constitutional or other basis for them not being able to take the 90-day? The 90-day, the basis they took it on was an actual threat, which this doesn't meet the definition. The U.S. Supreme Court says a true threat has to be intended to be communicated to the victim. These are two boys talking, and the other boy is a willing participant. And what's totally arbitrary about this is the second boy says – You mean a threat – if I say I'm going to go down to that school and shoot up all the students, and the students don't know, therefore I don't have a threat? Correct. That's the Supreme Court's position. But that doesn't mean the school can't take action. But that's not – it's not a criminal threat. I think you've – by interjecting the true threat cases, you've confused things, because that – that certainly would put the speech completely outside the protection of the First Amendment. Right. And the school doesn't even, I don't think, rely on that theory. They're saying, fine, maybe it's subject to some limited protection, but we've got Tinker, and they're invoking that standard. I think, again, the intent of the student to – whether the student intended to communicate this with the – you know, to intimidate the other people is irrelevant. It's whether this person is actually a danger – you know, there's a risk that he's going to act on it. Right. And I don't argue with that. I'll reserve my time. Let me just say, I think that probably it gets doubly compounded, because not only do we have the true threat cases, but then we have the Nevada statute, which you referenced. Right. But we'll give you – make sure you have time for rebuttal. But my question about that was, isn't the statute – you know, they can't charge criminally, and aren't they using it as another reference of definition, and it doesn't have – it's not necessarily saying it has to be intense. Well, okay. And I think the issue is they had a school rule that he didn't violate. How do you – how do you phrase a school rule that says two boys can't talk about violence and shootings anywhere? If the school learns about it, you can be expelled. That's not the school rule. Isn't the procedural due process claim that you're making on the 90 days, is that the substance of your claim? In part, procedural and substance, in the sense that the – they didn't – their own basis, they don't meet the standard. And the 10 days, you know, and I'll – I'm running out of time. But procedurally, he was given notice. He was – had an attorney. He had an opportunity to present his side of the case. He admitted what he said. I mean, he didn't deny any of these statements. No. So what procedural due process did he not receive? The procedure on the 10 day was they're supposed to, under Gospie Lopez, tell him what the charges are. They came up and just said, did you write this? Tell me about it, in jail. So they intimidated him. They got more information. And at the end, they say, here's what's going to happen to you now. So I wasn't able to reserve, but if you allow me to have some time for rebuttal, I'll make it brief and to the point. Thank you, Your Honors. Good morning. May it please the Court. I'm Anne Alexander, the attorney representing the Douglas County School District and the school district defendants in the matter. I think that when the school district disciplined Lander in the spring of 2008,  and the school district defendants. They concluded that they have the duty that Levine sets forth to prevent any kind of violence from campus. They contacted law enforcement so that if law enforcement deemed it appropriate, they could remove Landon from campus to make sure that the campus was safe. And then when they made their decision to suspend him for 90 days, they did so based upon an unambiguous state law that required that they do so under those particular circumstances. And then they kind of muddied it up by adding the criminal statute. And they never charged him with 388 or, pardon me, 392915. They simply said that it's a definition that's useful for us in trying to understand what it is that a threat is. So counsel is correct that they certainly were not in a position as a school board panel to find him guilty of 392915, and they did not. And the most important thing I want to emphasize here is that as I reread Levine v. Blaine, I thought there are aspects of that decision that can be copied and pasted practically into this one. But he never heard at the school. The student brought the poem to the school, did he not? Yes, he did, and handed it to a teacher. Are you suggesting there is no difference in this context of what we have here between whether the student does it at the school or he does it away from the school and between his pals and without reference to the school? What I can tell you is that other circuits recently, the Kowalski case out of the Fourth Circuit and others have held that in an electronic era, it is now also reasonably foreseeable that this kind of communication, particularly among students and about students, is going to find its way to campus. So I think that an electronic era changes that factor somewhat. And what I would point out is that the Supreme Court has had an opportunity in reviewing both J.S. and in Leshock, the other case, from the Third Circuit to consider whether or not Tinker applies to this kind of off-campus electronic communication, and I would disagree with the representation that J.S. did not say that Tinker applied and that Tinker could apply to off-campus speech. It held that it does apply. It simply said that on the facts of that case, there was no foreseeable risk of substantial disruption. So the Third Circuit has not held that Tinker does not apply to off-campus speech. Counsel, could I focus you on this thing that's troubling me based on plaintiff's counsel's argument? Just suspend the facts of this case for one second. We have the same kind of speech involved. The school takes the 10-day suspension, does the evaluation, and determines the psychologist's own agreement that this was just a joke, that the student really is of no threat whatsoever. Can the school, in your view, then say, but nonetheless, you're suspended for 90 days just merely because you said this? I think that the statute says that a school district or a principal shall deem a pupil a habitual discipline problem and impose a suspension of 90 days if they determine that a student has threatened. And it seems to me that if the school district could make an argument that they no longer believed there was a threat, that that would have been an option they could have taken, they could have made a representation that they were not, in fact, violating state law because they had concluded there was no threat. Here they concluded there was a threat. It's the very precise and specific kinds of language that he used that led them to that conclusion. Moreover, his best friend and one of his very closest friends were the individuals probably in the best position to judge whether or not these threats were credible and that he perhaps had some intent. This is not the case where the other kids are just laughing about it or do nothing. Believe me, we all, I think, recognize how frightening the speech is. But I'm just saying if the point comes when the school has done the required evaluations and everyone is in agreement that, no, this student is no risk that this student is actually going to act on the, what appear on, at least appears on its face to be a threat. There's no danger there. What's the school's interest in saying you're going to be barred from returning? I don't think the school would necessarily have an interest at that point going forward. Okay. So help me. I mean, your opponent says that that is what happened here, that there came a point when it was determined, no, he was a, this was just all a joke and he really wasn't a danger to act on it. Are you saying that the record shows otherwise? I'm telling you that the initial evaluation that was done showed that he was a moderate to a serious risk of harm. A second evaluation was done, I believe, at some point in May that showed it was simply a low to moderate risk of harm. I don't believe the record shows that Landon ever presented the evidence of that evaluation to the school district to make a request to have them reconsider in light of that evidence. So the 90-day suspension was implemented based on that first evaluation? Is that what you're saying? The 90-day suspension was based on the school district's conclusion that these were credible threats and that, therefore, the standard of threatening your fellow classmates had been made. Okay. Was the 90-day suspension imposed before that first evaluation came in? The 90-day suspension was proposed after the first one came in. Are you saying that he was a serious, a medium to severe? Moderate to severe risk. Okay. But make no mistake, I'm not telling you that the district had access to that. The parents had access to it. They had not made it available to the school district. They knew what it said. They had an option at his suspension hearing, his 90-day suspension hearing, to introduce that as evidence. But the school district did not have that evidence. And then so when the second one came, which was a decreased threat, that also did not come back to the attention of the school? It did not. There is no facts in the record that would show that the family ever made or requested the school district to reconsider that suspension in light of this information that might have caused them to mitigate the suspension. That request was never made. There's not actually a challenge to the Nevada statute here, is there? There is a challenge to the Nevada statute that was made for the very first time on appeal to you. Correct. And, of course, we argue that that Not in the hearing below and that was never challenged at his discipline hearing. No. And Mr. Blank and I have known each other for a long time. I understand that he argues that it seems illogical to him to have a statute called habitual discipline problem when among the various kinds of infractions, a student actually can be deemed a habitual discipline problem for simply engaging in one active threat. But as Judge Hicks pointed out, there's no ambiguous reading of that statute except for that sort of objection to the adjective used in the title. So I guess the other thing I would add, I believe that you asked Mr. Blank what is the constitutional objection then for this particular school district's decision to suspend him for 90 days. And I want to be clear as well here that the district counted the first 30 days that he spent in jail. They didn't tack on another 90 after that. They included all of that time spent away from school. And it seems to me that that would be an objection based upon a denial of substantive due process. And I cannot fathom that it would shock the conscience to impose a 90-day suspension during which he would be required to get a psychological evaluation before coming back to school, based upon the language that you saw in those e-mails. Finally, if the objection is to whether or not the district should have managed this differently, handled it a little more like they did in Levine v. Blaine where they had benefit of a Washington statute that gave them the authority to make these emergency suspensions or expulsions. Nevada doesn't have that law. But if there's an objection to the amount of discipline that was imposed, almost as though we're acknowledging, there's no First Amendment violation here. If we're just arguing about the amount of discipline imposed or how they managed it, I would just recall that this circuit and that the Supreme Court in Wood v. Strickland since 1975 has said that the Federal court is not the place to re-litigate even disciplinary decisions that we might think in retrospect were perhaps unwise. If there's nothing further, I'll thank you for your time. Mr. Blank, your time is up, but I'm going to ask the clerk to put a minute back on the clock for you so you've been restored. The school district did not ask for an eval, did not let them know that was even a possibility, and they didn't even request one one way or the other. They made their decision solely based on strict liability. You said these words and we learned of it, and therefore you're out for 90 days. The parents had no option. We're supposed to go petition the school to come back, come back. It's like, no, they wouldn't even give him alternative school. They said you're out. And that is the First Amendment violation, because what they're relying on is he made a threat. That's what the statute says. Not that he disturbed the school or he did something inappropriate. They relied on a statute specifically that said he made a threat, and he didn't. And that's where the First Amendment comes in. You can't punish. What rule did Landon know he was violating? Who told him not to say this to his friend? And his friend also said, I'll bring knives, bombs, gasoline and guns. He's not punished at all. That shows you the arbitrary nature of what they did. I'll punish him, but not the other. What's prohibited, nobody knows. And I'll submit. Thank you, Your Honor. Thank you. Thank you both for coming from Nevada and for your argument this morning. Weiner v. Douglas County is submitted. The next case for argument will be C.D. v. City of Sonora. So you can get set up and ready to go. We'll take a short break and then be back. Thank you.
judges: Zilly, McKeown, Watford